IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

QUINTON HARRIS, GEOFFREY MILLER,
NORMAN MOUNT, SCOTT ZINN,
THOMAS TAYLOR, and JOHN BAKER,

           Plaintiffs,

    vs.

UNION PACIFIC RAILROAD COMPANY,

           Defendant.

**8:16CV381**

**MEMORANDUM AND ORDER**

      This matter is before the Court on plaintiffs' objection, Filing No. 253, to the magistrate judge's order, Filing No. 238, granting defendant's motion for a protective order, Filing No. 214; the motion to exclude the expert opinion of Dr. Kevin Trangle, Filing No. 262, filed by Union Pacific; the motion to strike the expert report of Dr. John Holland, filed by plaintiffs, Filing No. 270; the motion to exclude the testimony of expert Paul Dillard, filed by Union Pacific, Filing No. 275; the motion to exclude testimony by expert Michael Collins, Filed by Union Pacific, Filing No. 278; and the motion to exclude or strike the expert report of Dr. Ali Saad, filed by plaintiffs, Filing No. 282.

      This case is a putative class action suit and involves claims of employment disability discrimination under the American with Disabilities Act (ADA), 42 U.S.C. § 12112 et seq. and the Genetic Information Nondiscrimination Act (GINA), 42 U.S.C. § 2000ff-1(b). Filing No. 20, Amended Complaint.[1]

---

[1] The amended complaint also involves a number of state law claims related to civil rights, genetic rights, and human rights statutes. Filing No. 20, Amended Complaint.

On review of a decision of the magistrate judge on a pretrial matter, the district court may set aside any part of the magistrate judge's order that it finds is clearly erroneous or contrary to law.  28 U.S.C. § 636 (b)(1)(A); Fed. R. Civ. P. 72(a); *In re Lane,* 801 F.2d 1040, 1042 (8th Cir. 1986).  *See also Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 764 (8th Cir. 1995) (noting "a magistrate is afforded broad discretion in the resolution of nondispositive discovery disputes").  The Court finds that the magistrate judge's findings are clearly erroneous or contrary to law.

## I.    Background

Union Pacific has a company-wide Fitness-for-Duty ("FFD") program.  *See* Filing No. 20, Ex. A. In 2014, Union Pacific made changes to this program.  Employees in certain positions under the new policy are required to disclose specific health conditions, and the newly implemented policy automatically excluded employees who disclosed these conditions from employment.  These employees then had to have a fitness for duty evaluation, and according to plaintiffs, Union Pacific routinely ignores the medical opinions of outside doctors.  The records are sent to Dr. John Holland in Olympia, Washington.   Dr. Holland does not do a physical evaluation, but he and his designees make all decisions regarding who is fit for duty.

Plaintiffs are all previous employees of Union Pacific.  Many had worked for years, were qualified and performing their jobs with no problems.  They were pulled from their jobs under their new program, evaluated, and then excluded from their positions at Union Pacific, even though they had no trouble fulfilling the essential functions of their jobs.

## II.    Discussion

### A.    Objection to the Report and Recommendation of the Magistrate Judge

The New Policy[2] requires that an employee must disclose certain conditions to

---

[2] The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services, and Mechanical positions), and Dispatcher positions, disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific label "Reportable Health Events":

A. Cardiovascular Conditions including:

1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).

2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.

3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.

4. Stroke or Transient Ischemic Attack (TIA).

5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral)

6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty, or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

B. Seizure or Loss of Consciousness including:

1. A seizure of any kind.

2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).

3. Treatment with anti-seizure medication to prevent seizures.

4. Loss of consciousness (of any duration including episode caused by insulin reaction).

C. Significant Vision or Hearing Change including:

1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).

2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).

3. Significant hearing loss or surgery on the inner ear.

4. New use of hearing aids.

D. Diabetes Treated with Insulin:

Union Pacific. Thereafter, the employee must obtain an FFD examination. Further, the employee must (1) stay off work until the evaluation has been conducted and the employee deemed fit for work; (2) notify his or her supervisor that the employee has a reportable health event and cannot work; and (3) notify health and medical services that the employee must complete an FFD evaluation. Further, under the medical rules, FFD evaluations are also automatic for an employee who transfers "from an existing Union Pacific job assignment to a different job assignment outside of the provisions of the collective bargaining agreement . . . [t]o a Dispatcher position or an Operating Department field position (including all Transportation, Engineering Services, and Mechanical position – agreement and nonagreement), and/or (b) [t]o a position requiring regulatory certification, and/or (c) [t]o other selected positions, where it is determined that a Job Transfer Evaluation is needed, based on physical and functional requirements of the job". Filing No. 20, ¶ 5. Plaintiffs contend that Dr. Holland routinely finds employees not fit for work and routinely finds that their medications keep them from returning to their positions at Union Pacific. Each of the plaintiffs tell a story of this type that took them out of service

---

1. Including Type I and Type II Diabetes Mellitus if insulin is used.

2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).

E. Severe Sleep Apnea:

1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

Filing No. 20, Exhibit A.

4

and away from their jobs, generally because of these "Sudden Incapacitation Restrictions." *Id.* at ¶ 16. They were disqualified from employment despite that in most cases, their treating physicians cleared them for work.

Defendant Union Pacific moved for a protective order shielding it from plaintiffs' interrogatories Nos. 23 and 24[3] and from all future inquires regard Union Pacific's color vision testing. Plaintiffs contested this motion, arguing the color vision testing information they requested is relevant to their disability claims in this case. The magistrate judge

---

[3] These interrogatories state:

**INTERROGATORY NO. 23:** For each year from 2010 to the present, provide the total number of Union Pacific employees who were subjected to a color vision field test other than a color vision field cannon test by Union Pacific, and the number of those employees who failed that color vision field test within that year.

**ANSWER**: Defendant objects to Interrogatory No. 23 as beyond the scope of Federal Rule of Civil Procedure 26. None of the Named Plaintiffs were pulled from

service because of a vision or hearing issue, and there are no allegations in the First Amended Complaint regarding regulatory exams for hearing or vision. Employees subjected to a color vision field test are not typically considered to be employees subject to fitness-for-duty evaluations related to a Reportable Health Event. Indeed, employees subjected to a color vision field test are those who failed their regulatory exam, the Ishihara, which is a separate process from the Fitness-for-Duty process that the Named Plaintiffs went through. Employees subjected to a color vision field test are not necessarily included in Plaintiffs' class definitions, which are also vague and overly broad.

**INTERROGATORY NO. 24:** For each year from 2010 to the present, provide the total number of Union Pacific employees who were subjected to Union Pacific's color vision field cannon test, and the number of those employees who failed that color vision field cannon test within that year.

ANSWER: Defendant objects to Interrogatory No. 23 as beyond the scope of Federal Rule of Civil Procedure 26. None of the Named Plaintiffs were pulled from service because of a vision or hearing issue, and there are no allegations in the First Amended Complaint regarding regulatory exams for hearing or vision. Employees subjected to a color vision field test are not typically considered to be employees subject to fitness-for-duty evaluations related to a Reportable Health Event. Indeed, employees subjected to a color vision field test are those who failed their regulatory exam, the Ishihara, which is a separate process from the Fitness-for-Duty process that the Named Plaintiffs went through. Employees subjected to a color vision field test are not necessarily included in Plaintiffs' class definitions, which are also vague and overly broad. Filing No. 215-5 at 3-4.

determined that the color vision testing information is not relevant and granted Union Pacific's motion for a protective order.

Plaintiffs point out that they bring this action on behalf of a class of individuals. The class includes:

> [ADA Class:] Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

Filing No. 20, First Am. Compl. ¶ 116. In that regard, Union Pacific implemented a new color vision field test known as CVFT "Light Cannon" test. Filing No. 215 at 5; Filing No. 229-4, Ex. 3, Lewis Dep. 86:11-87:14. In April 2016, Defendant replaced its color vision field test ("CVFT") with a new CVFT, the "Light Cannon" test. The old CVFT used existing train signals in the field, while the new Light Cannon test uses a mobile light cannon device that Union Pacific developed in-house. Dr. Lewis—the AMD responsible for making FFD determinations relating to color vision—testified that "the majority fail" the new Light Cannon test. Filing No. 229-4, Ex. 3, Lewis Dep. 92:4-14. He further testified that the passage rate "was probably much higher with the old field test than it is now." *Id.* at 93:7-20. Dr. Lewis has also seen a number of employees who passed the old test and failed the new one. *Id.* Plaintiffs contend that persons with purported color vision deficiencies are unquestionably part of this case. Paragraph 116 of the Amended Complaint specifically includes all adverse employment actions "related to a Fitness-for-Duty evaluation. Filing No. 20. Dr. Lewis testified that cases where employees fail a color vision exam are part of Defendant's FFD program and that Union Pacific employees

have suffered adverse employment actions when they failed this test.  Filing No. 229-4, Ex. 3, Lewis Dep. 27:11-17.[4]

Plaintiffs' expert, Dr. Jay Neitz, filed a rebuttal to the expert of Union Pacific, Dr. Holland.  Dr. Neitz discusses the Federal Railroad Administration (FRA's) color vision requirements for conductors and engineers.  Filing No. 217, at 2-3.  He further considers the cases of seven employees who were removed by Union Pacific from their jobs.  He states that "[t]here is no rigorous scientific study published in a peer-reviewed scientific or medical publication that demonstrates the CV Light Cannon is valid, reliable and a comparable test for visual capacity" as required by the FRA.  Filing No. 217 at 11.

The Court agrees with the plaintiffs.  Under Rule 26, a party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Information "need not be admissible in evidence to be discoverable."  Id.  To justify a protective order limiting the broad reach of discovery, the moving party is required to make "a particular and specific demonstration of fact, as distinguished from stereotype and conclusory statements," Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n. 16 (1981), that the discovery sought subjects the moving party to "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).  The Court may issue a protective order only for good cause.  Id. A party seeking a protective order must show that a "clearly defined and serious injury" would result if the discovery was conducted, Constand v. Cosby, 229 F.R.D. 472, 479 (E.D. Penn. 2005), and "[s]uch [a] determination must also include a consideration of the

---

[4] It is unclear if Union Pacific's practice has changed, but regardless, these restrictions were being imposed well into this lawsuit.

7

relative hardship to the non-moving party should the protective order be granted." *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973).

Defendant is not entitled to a protective order. We are at the discovery phase of this lawsuit. Following discovery, if the evidence points otherwise, Union Pacific is free to file another motion. But at this point, Union Pacific must answer Interrogatories numbered 23 and 24 and disclose the requested information. Union Pacific cannot show good cause; it has not shown hardship; and its argument that this is without relevance is incorrect. The allegations made by the plaintiffs clearly encompass vision testing as it is included in the FFD program. The representation in this case is for all who suffered adverse employment actions related to Union Pacific's FFD program. The criteria have been applied to the vision testing and utilized by Dr. Holland on behalf of Union Pacific. Further, for all these reasons, Dr. Neitz's rebuttal report is relevant and will not be excluded.[5]

B. Law – Motions in Limine

The admissibility of expert testimony is governed by the Federal Rules of Evidence and the principles laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The district court's "gatekeeping obligation" applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires that: "(1) the

_____

[5] Union Pacific also contends that Dr. Neitz's report was not properly disclosed nor disclosed in a timely manner. The Court reviewed the record and determines this is a nonissue. Dr. Neitz's identity and report were provided to Union Pacific by the rebuttal expert deadline; there is still time to depose Dr. Neitz; his report will relate to a possible business necessity defense; and he will testify about the validity of the testing for the Light Cannon. This expert opinion may dispute Dr. Holland's expert opinion that defendant's use of the Light Cannon test is justified by FRA.

evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy." *Kudabeck v. Kroger Co.*, 338 F.3d 856, 859 (8th Cir. 2003).   Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Id.* at 860.

When faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both relevant and reliable. *Kumho Tire Co.,* 526 U.S. at 147; *Daubert,* 509 U.S. at 589; *United States v. Wintermute*, 443 F.3d 993, 1000 (8th Cir. 2006).   A trial court must be given wide latitude in determining whether an expert's testimony is reliable.   *See Kumho Tire,* 526 U.S. at 152.   This analysis requires that the court make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology . . . can be [properly] applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

The court may consider several factors in determining the soundness of the scientific methodology including: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique; and (4) whether the theory or technique used has been generally accepted in the relevant scientific community. *Id.* at 593-594.   Courts must focus on the principles and methodology rather than the conclusion they generate.   *Id.* at 595.

"[N]othing in Rule 702, *Daubert*, or its progeny requires 'that an expert resolve an ultimate issue of fact to a scientific absolute in order to be admissible.'" *Kudabeck*, 338 F.3d at 861 (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)). Rather, the proponent of expert testimony bears the burden of providing admissibility beyond a preponderance of the evidence. *Lauzon v. Senco Prods.*, 270 F.3d 681, 686 (8th Cir. 2001). When the application of a scientific methodology is challenged as unreliable under *Daubert* and the methodology itself is otherwise sufficiently reliable, outright exclusion of the evidence is "warranted only if the methodology was so altered by a deficient application as to skew the methodology itself." *United States v. Gipson*, 383 F.3d 689, 697 (8th Cir. 2004) (brackets omitted) (quoting *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993)).

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir.2002) (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)). However, it also is true that if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded. *Id.* An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported. *Id.*

The objective of the *Daubert* inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. 2015). This is a flexible, case-specific inquiry: the Court must decide whether this particular

expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case. *Id.* at 723.

*Daubert* established a non-exclusive checklist for trial courts to use in assessing the reliability of expert testimony, including whether the theory or technique can and has been tested, whether it has been subjected to peer review, whether there is a high known or potential rate of error, and whether the theory or technique enjoys general acceptance within a relevant scientific community. *See United States v. Holmes*, 751 F.3d 846, 850 (8th Cir. 2014) (citing *Daubert*, 509 U.S. at 592–94).

### 1. Expert opinion of Dr. Trangle

Union Pacific moves to exclude portions of expert opinions of plaintiffs' expert, Dr. Trangle, Filing No. 262. Union Pacific contends that the proffered testimony of Dr. Tangle goes beyond the specifics of the 12 people he reviewed in his expert report. Further, Union Pacific argues Dr. Trangle is not qualified to offer a statistics-based conclusion, and in any event, the 12 individuals cannot provide a representative sample for the rest of the putative class that plaintiffs want to certify. Union Pacific argues the opinions do not comply with Fed. R. Civ. P. 702 and *Daubert.*

In response, plaintiff argues that Dr. Trangle is qualified as he is a board-certified occupational medicine doctor. Plaintiff further argues that his testimony is reliable. He is a medical doctor who is regularly involved with FFD determinations both from an individual and a policy perspective. For his opinion he reviewed Union Pacific's memos, policies, procedures, guidelines, appendixes, other documentation, and the individuals that he reviewed. He testified that the only statistics he opined in were in the medical literature he reviewed. Filing No. 263-A1, Trangle Dep. (5-16-18) 95:20-96:4. The data

confirms that over 7,000 Union Pacific employees have been subjected to a FFD evaluation due to a "reportable health event" during the applicable statutory period, from September 18, 2014 to the present. *Id.* at ¶¶ 4, 5 & Filing No. 248, Schug Decl.; *see also* Filing No. 248-29, Defendant's Fourth Set of Supplemental Responses to Plaintiffs' Requests for Production to Defendant, Set I). According to plaintiff the data shows:

> • The available data reveal that at least 3,145 of the workers were designated as not cleared to work or were issued work restrictions as a result of their fitness-for-duty determinations.
> \*\*For workers identified in Union Pacific's records as having a "critical diagnosis," the data reveals that they were not cleared to work or were given work restrictions at very high rates, often exceeding 50%.
> • Workers were commonly given long-term restrictions, often lasting hundreds of days, if not years.

Filing No. 248-34, Wise Decl. ¶¶ 6-12, Tables 1-2 & Filing No. 248, Schug Decl. ¶¶ 15-18.

The Court has reviewed the briefs and supporting evidence. The Court finds no basis for excluding this expert's testimony, based on his review of the employee's and the relevant documents maintained by Union Pacific. *See David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) (noting that if a party thinks other assumptions and methods are more appropriate, it may make this apparent through cross-examination and by presenting its own expert witness). The Court finds that it does not appear that Dr. Trangle is offering a statistical opinion. Accordingly, the Court finds that Dr. Trangle is a qualified expert, he is testifying in his area of expertise, and his testimony is relevant.

2.   Motion to strike the expert report of Dr. John Holland

Plaintiffs move to strike the expert report of Dr. John Holland. Filing No. 270. Plaintiffs contend that the expert report is only two-pages with 2,900 pages of exhibits and is

deficient and contains no complete statement of his opinions as required under the rules. Plaintiffs state that "Dr. Holland asserts that his opinions regarding Union Pacific's FFD program, including its reportable health events policy, are contained in one of those exhibits: a 355-page hodgepodge of various documents attached as Exhibit B." Filing No. 215-6, Holland report at 2; *see also* Filing Nos. 230-8 through 230-14, Exhibit B. Nearly all of the 2,900 pages contain work restrictions, standards, facts and data, federal regulations, other experts and medical information.  During a July 12, 2018 deposition, Dr. Holland testified: "the document attached…, such as Exhibit B, provide a description of my opinions regarding Union Pacific's medical rules, the Fitness-for-Duty program…, reportable health events, and Union Pacific's drug and alcohol rules." Filing No. 272-6, Holland (7-12-2018) Dep. at 214:23-215:13, Filing No. 272, Baures Decl. Ex. 6; see also Filing No. 272-4, Holland (8-9-2018) Dep. at 415:24-416:11.

Dr. Holland indicated that his opinions were contained in the exhibits, not the body of the report.  Under the Federal Rules of Civil Procedure, experts must disclose in a written report "a complete statement of all opinions" they would offer at trial "and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i).  When a party fails to provide information in compliance with Rule 26(a), the Court "may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) (citing Fed. R. Civ. P. 37(c)(1)); *see also* *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, (8th Cir. Oct. 4, 2018) ("The disclosure mandates in Rule 26 are given teeth by the threat of sanctions in Rule 37.").  There is no complete statement of Dr. Holland's opinions, and thus, offers plaintiff, his expert report must be stricken.

Defendants disagree and argue that the opinions are listed clearly in the

attachments.  For example, Dr. Holland listed the following in Ex. B:

> It is also generally accepted within the medical community that individuals with implanted cardiac devices should not be exposed to EMF above the device manufacturer's published exposure limits, to protect the health of the individual." (Dr. Holland Expert Report-Ex B-Cardiac-00004).
> - "This systematic review [of the FMCSA's regulations and guidance use on the use of medication by commercial truck drivers] provides evidence that 20% to 40% of persons taking opioids for chronic pain complaints misused these drugs or abused other substances, and that physicians have very poor ability to judge [which] patients would abuse or misuse their pain medications." (Exh. A1 at Dr. Holland Expert Report-Ex B-Drug_Alcohol-00003).
> - One of the "benefits of medical FFD guidelines" is that they are "scientifically valid, uniformly applied (reliable), and specific." (Exh. A1 at Dr. Holland Expert Report-Ex B-FFD_RRC-00173).
> - "Relying on such evidence-based guidelines for clinical decision-making is increasingly recognized as the appropriate method for deciding medical issues both in clinical practice and in the courts."2 (Exh. A1 at Dr. Holland Expert Report-Ex B-FFD_RRC-00235).
> - "This [1%] threshold of acceptable risk used by HMS for seizures and other health-related causes of sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook." (Exh. A1 at Dr. Holland Expert Report-Ex B-FFD_RRC-00248).
> - "Adults with new onset seizure disorders are at significantly increased risk for future seizures, based on multiple studies in the scientific literature." (Exh. A1 at Dr. Holland Expert Report-Ex B-Seizure-00001).

Filing No. 287, at 3.  Another example given by the defendant is Dr. Holland's statement

that "Mr. Harris was given ongoing (long-term) medical work restrictions by UPRR Health

and Medical Services because we determined he has a chronic health condition, epilepsy,

that places him at unacceptably high risk for sudden incapacitation at work due to a

seizure."  *Id.*  The defendants further argue that Dr. Holland has undergone extensive

deposition testimony and filed a rebuttal expert report that provided more notice and explanation of his opinions.

The Court shares some of the concerns expressed by plaintiffs. Mr. Holland's expert opinions are not expressed as clearly as possible, nor are they necessarily easily identifiable. However, given the amount of discovery that has occurred, the Court will permit Mr. Holland to testify. However, if Mr. Holland attempts to testify on matters not contained in his expert report, the plaintiffs are free to so object at trial, and the Court will take up the matter at that time.

3. Motion to exclude the testimony of expert Paul Dillard

Union Pacific contends that expert witness Paul Dillard is not qualified to give an opinion on railroad industry standards reasonable care. Filing No. 275. Union Pacific contends that Mr. Dillard is an expert in the trucking industry, but he has no qualifications, education, experience or knowledge about the railroad industry. He is a safety consultant with the trucking industry. Dillard's opinions in this case are apparently based upon his thirty years in the transportation industry as it relates to the operation of commercial and non-commercial motor vehicles on the roadway. Thus, argues Union Pacific, Mr. Dillard is not qualified to offer an opinion regarding railroad industry standards. *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d at 709 (8th Cir. 2001).

Plaintiff contends that Mr. Dillard will testify that Union Pacific's interpretation and application of the Federal Motor Carrier safety Administration FMCSA standards is far more restrictive than it should be, and that defendant failed to conduct individualized assessments in accordance with regulations. Plaintiffs contend that Union Pacific has retained expert Dr. Michael Greenberg to opine that the safety paradigms promulgated

15

for commercial drivers are also applicable to railroad employees. Filing No. 249-31 at 6. Plaintiffs contend that defendants constantly rely on commercial trucking standards when forming its FFD and reportable health events policies. *See e.g., In re Zyprexa Products Liability Litigation*, 489 F.Supp.2d 230, 282 (E.D. N.Y. 2007) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.").

Union Pacific agrees that it adopted, but then modified, some of the FMCSA's guidelines. The railroad, argues Union Pacific, is not required to follow those regulations.

The Court finds that Union Pacific appears to rely on the FMCSA standards, at least to some extent. As a result, the Court finds that the testimony of Mr. Dillard is relevant, and he is qualified to give opinions relating to those standards, although limited. Union Pacific's own expert, Dr. Greenberg, stated: "Union Pacific relied on guidance provided by the Federal Motor Carrier Safety Administration[.]" Filing No. 249-31 at 13.

The Court will permit plaintiffs to lay foundation showing that Union Pacific adopted these standards in part. If plaintiffs are able to do so, then the testimony, at least in part, of Mr. Dillard becomes relevant. If plaintiffs cannot establish that these standards were used by Union Pacific, then the testimony will not be relevant and will lack foundation. Therefore, at this point, the Court is willing to allow plaintiffs to proceed with the testimony at trial, and the Court will make a final ruling as the evidence is received. With that said, Mr. Dillard will not be permitted to testify outside of his area of expertise.

4.  <u>Motion to exclude testimony of plaintiff's expert witness, Michael Collins</u>

Union Pacific moves to exclude the expert report of Michael Collins (Filing No. 278) on the basis that Mr. Collins has no opinion specific to Union Pacific, and his testimony regarding railroad employers is not based on the facts in this case, any published data, a recognized methodology, or an objective analysis.  Mr. Collins's opinions revolve around railroad employers who use disability programs to rid employees from their payrolls, as senior workers generally make the highest salary and often use the health insurance plans more frequently.  Although he expresses those opinions, Union Pacific argues that Mr. Collins has no examples that this has happened, has not looked at the data regarding unfair disqualifications, and has no idea how many unfair medical disqualifications the Railroad Retirement Board receives in a year.  He also did not rely upon any current data or publications to support his opinions.  Accordingly, argues Union Pacific, there is no foundation for Collins's opinion.  Finally, Union Pacific argues that Mr. Collins cannot testify to counter Union Pacific's defenses of mitigation and estoppel, as he did not do so initially under Rule 26.

Plaintiffs contend that the Railroad Retirement Board (RRB) benefits are relevant and important for the jury's understanding of RRB benefits.  Mr. Collins has worked his entire career for the RRB since 1975.  Plaintiffs contend that Mr. Collins's opinions will relate to the question: why Union Pacific revised its FFD policies.  Plaintiffs will present evidence that it was to exclude individuals with disabilities; will show that the workplace at Union Pacific shrunk by about 10% from 2014-16 after the FFD program was implemented; and incentives built into the RRB system.

The Court is concerned that the testimony is not specific to Union Pacific. Plaintiff contends that Rule 702 permits "the venerable practice of using expert testimony to educate the factfinder on general principles." Fed. R. Evid. 702, advisory committee's note to 2000 Amendment. As such, "an expert on the stand may give a dissertation or exposition of . . .principles relevant to the case, leaving the trier of fact to apply them" because "the trier can itself draw the requisite inference." Id., (advisory committee note to proposed rule).

The Court finds Mr. Collins is allowed to testify as to RRB occupational disability annuity process as set forth in his report. Further, the Court finds that RRB can testify as to any defenses of mitigation or damages or estoppel. On the issue of whether Mr. Collins can testify regarding whether the revised policies were passed to create these to discharge expensive employees from their payrolls, the Court will not make a decision at this time. If sufficient foundational evidence of such is presented as to Union Pacific, the Court will consider allowing Mr. Collins to testify as to his specialized knowledge that relates to such terminations. However, the Court is not going to permit Mr. Collins to testify regarding his general knowledge, absent some connection to Union Pacific's practices in this regard.

5. Motion to exclude or strike export report of Dr. Ali Saad

Plaintiffs move the Court for an order striking the expert report and testimony of Dr. Saad as untimely and improper, Filing No. 282. Dr. Saad is a rebuttal expert to Dr. Trangle. He specializes in occupational medicine and has been a medical director of several companies, including some related to the railroad industry. Plaintiff contends that Dr. Saad merely compiled some of Union Pacific's information and summarized the

documents.  The expert opinion of Dr. Saad does not, according to plaintiffs, rebut Dr. Trangle's testimony.  His firm "perform[s] economic and statistical analyses in connection with litigation and other consulting situations."  Filing No. 283, ¶ 6, Report of Dr. Ali Saad ("Saad Rep.") at p. 1, Schlesinger Decl. Ex. 3.  In his report, Dr. Saad repeatedly confirms that he does not have any opinion regarding Dr. Trangle's medical opinions and responds to Dr. Trangle's claims only in his "capacity as an economist and statistician." *See, e.g., id.* at 2; Filing No. 283, ¶ 9.

Dr. Saad attempts to opine that the analysis used by Dr. Trangle in his opinions is flawed and inaccurate.  Dr. Saad will further testify that the statistical inferences made by Dr. Trangle are not statistically sound.  Dr. Saad contends that Dr. Trangle's sample is statistically unrepresentative.  Plaintiffs argue that Dr. Trangle does not intend to give a statistical opinion, but instead, is providing anecdotal evidence regarding Union Pacific's policies and practice.  *See also Catlett v. Missouri Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987) (statistical evidence or anecdotal evidence may be sufficient to establish a pattern or practice of discrimination).  Dr. Saad stated in his deposition: "This is not what I call a statistically heavy assignment. This is more of a—you might characterize it as quantitative . . .. That information was presented mostly in a fairly straightforward manner and was not analyzed in a specific statistical way." *See* Saad Dep., Filing No. 284-3, at 20:14-24.

Dr. Saad attempts to address two conclusions made by Dr. Trangle: (1) that Union Pacific "employees were generally grouped into different classifications and a general application of restriction was applied"; and (2) that Union Pacific uses "job exclusion to those with certain health conditions as a way to significantly cut costs." *Id.* at 3 (quoting

Expert Report of Dr. Kevin Trangle ("Trangle Rep."), Filing No. 249-05, at 1, 10). However, during his deposition, Dr. Saad testified that he had no specialized training or knowledge regarding fitness for duty determinations; he did not analyze the data in a specific statistical way; he did not analyze the FMCSA policies or guidelines nor any railroad guidelines. He relied on data he received from Union Pacific's eHealthSafe system and did not apply the medical review processes. He looked at groups and outcomes in the eHealthSafe system. Plaintiffs contend this is lay testimony masquerading as expert statistical analysis. They argue that a jury could easily figure this out without the help of an expert. For example, Dr. Saad will testify that x number of Union Pacific employees with y disabilities were referred for medical evaluations. He will then tell the percentage that were retained and those that were let go. According to plaintiffs, his other conclusions about this data are pure speculation.

The district court must determine whether a specific expert has specialization to assist jurors with making decisions on specific issues in the case. *Kumho Tire Company, LTD. v. Patrick Carmichael*, 526 U.S. at 156. It is clear that Dr. Saad is an economist and not a medical expert of any kind. He has been retained to rebut testimony of an occupational medicine specialist. He has no training related to medicine. He does not have any knowledge regarding Union Pacific's FFD program and reportable health events policy. The Court agrees that Dr. Sadd does not meet the criteria of Rule 702. The Court will exclude paragraphs 23 through 75, including exhibits 1 through 22, of Dr. Saad's report as inadmissible pursuant to Fed. R. Evid. 702. The Court finds Dr. Saad is not qualified to rebut the expert opinions of Dr. Trangle, and further, the testimony in this regard will not be helpful at trial and is speculative.

THEREFORE, IT IS ORDERED THAT:

1. Plaintiffs' objections, Filing No. 253, are sustained.

2. The Order of the magistrate judge, Filing No. 238, is overruled and reversed.

3. Defendants are ordered to comply with the discovery and answer interrogatory questions #24 and 25 within 30 days of the date of this Memorandum and Order.

4. Defendant's motion for a protective order, Filing No. 214, is denied.

5. Defendants' motion to exclude the testimony of Dr. Trangle, Filing No. 262, is denied.

6. The motion to exclude Dr. Holland's testimony, Filing No. 270, is denied.

7. The motion to exclude the testimony of Mr. Dillard, Filing No. 275, is denied at this time.

8. The motion to exclude Dr. Collins, Filing No. 278, is denied except as set forth herein.

9. The motion to exclude Dr. Ali Saad, Filing No. 282, is granted.


Dated this 1st day of February, 2019.

                                        BY THE COURT:

                                        s/ Joseph F. Bataillon
                                        Senior United States District Judge